Jessie B. WILLIAMS, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 71S00–9909–CR–461.

Supreme Court of Indiana.

Feb. 2, 2001.

Sean P. Hilgendorf, South Bend, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice.

Jessie B. Williams appeals from his convictions for murder, attempted murder, and robbery for his role in the shooting deaths of Bennie Spears and James Edison and the attempted murder of Almeka Dodds. In this direct appeal, Williams raises four issues for our review which we rephrase as follows: (1) did the trial court err by admitting evidence that Williams was known by a nickname; (2) did the trial court err by refusing to strike the entire testimony of a State's witness; (3) was the evidence sufficient to support the convictions; and (4) did the trial court err by imposing consecutive sentences?

We affirm the judgment of the trial court.

### Facts

The record shows that Bennie Spears and Almeka Dodds lived in South Bend with their two children, Jasmine, age two, and James, age one. James Edison, a friend of Spears, was visiting their home on the afternoon of January 30, 1997. As Dodds was preparing to leave with her children, there was a knock at the door. Dodds recognized the two visitors as "Flint" and "Gill." Flint was a friend of Spears who had been to their home several times before; however, Dodds had met Gill only a couple times, and Gill had never been to their home before. The four men were in the living room talking. Dodds, who was with her children in the dining room, overheard Spears tell Flint not to point the gun at him. Dodds then heard a gunshot. When she turned around, she saw that Spears had been shot and Flint was holding a gun.

Flint grabbed Dodds by the hair and demanded money. Dodds retrieved approximately $5,000, which was hidden in the couch. Flint then instructed Gill to lock James and Jasmine in the bathroom and cut Edison's throat with a knife. After Gill locked the children in the bathroom, he retrieved a knife from a kitchen drawer and began to comply with Flint's request. Flint told Gill that he was not doing the job properly and that he would do it instead. Flint then ordered Gill to take Dodds to the basement and shoot her twice in the head. Once in the basement, Dodds begged Gill not to shoot her. Flint, believing Edison was dead, went to the basement to see what was taking so long. Meanwhile, Edison, still alive, jumped through a window. When Flint and Gill heard the breaking glass they ran upstairs and fired at Edison twice as he was at-

tempting to escape. Dodds hid in the basement. Either Flint or Gill returned to the top of the stairs and fired shots into the basement. None of the shots hit Dodds. When the gunfire ceased, Dodds ran to her neighbor's house and called police. When police arrived, they found James and Jasmine locked in the bathroom. Autopsies later revealed that Spears and Edison both died of gunshot wounds to the head.

Dodds immediately went to the police station to give a statement. She told police that she knew the two gunmen and that their names were "Flint" and "Gill." She then looked at several photo arrays. Dodds positively identified Flint as Freddie Byers. Although she was unable to make a positive identification, Dodds told police that one of the pictures looked like Gill. That picture was of the defendant, Jessie B. Williams. Over a year and a half later, in September 1998, police compiled another photo array. Dodds positively identified Williams in that photo array as the person she knew as Gill.

Kenyata Blackwell, Dodds' sister, also went to the police station on the evening of the crimes. Although Blackwell was not present during the crimes, police asked her to identify individuals known to her as Flint and Gill. Blackwell looked at several photo arrays and positively identified Flint as Freddie Byers and Gill as Jessie Williams.

A jury convicted Williams of two counts of murder, two counts of felony murder, one count of attempted murder, and one count of robbery. The trial court vacated the felony murder convictions. The trial court then ordered Williams to serve consecutive sentences of sixty-five years for each murder conviction, fifty years for the attempted murder conviction, and twenty years for the robbery conviction, for a total sentence of 200 years. This direct appeal followed. Additional facts are set forth below where relevant.[1]

### Discussion

#### I.

■ Williams first challenges Blackwell's testimony. Blackwell testified to the following at trial: She knew two men who went by the nicknames Flint and Gill, and she often saw them together; Spears introduced her to Gill approximately six months before the night of the crimes; she had seen Gill three or four times in the six months prior to trial; and she was not present during the crimes, but she went to the police station shortly thereafter to look at several photo arrays and identified Flint as Byers and Gill as Williams. R. at 479, 480, 481–82, 483, 484, 493. Williams asserts this testimony was inadmissible because it was irrelevant and unduly prejudicial.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Generally speaking, relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid. R. 402. However, relevant evidence may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403.

Williams argues that Blackwell's testimony is irrelevant because "[t]he fact that Williams was known to Blackwell as 'Gill' does not tend to make his involvement on the evening of January 30, 1997, more probable or less probable than it would be without such evidence." Brief of Appellant at 11. We disagree. Identity was a key issue at trial. R. at 434–51. Dodds told police that she knew the two gunmen and they went by the names of Flint and

---

1. In a separate trial Freddie Byers, Williams' accomplice in this case, was also convicted of two counts of murder, one count of attempted murder, and one count of robbery. He too was sentenced to a total term of 200 years imprisonment. *Byers v. State,* 709 N.E.2d 1024 (Ind.1999).

Gill. Although Dodds was unable to identify Gill on the night of the crimes, she told police that Blackwell knew Gill better and Blackwell should view the photo arrays. R. at 445–46. That Blackwell then identified Gill as Jessie Williams indeed makes it more probable that Williams was involved in these crimes. *See Ealy v. State*, 685 N.E.2d 1047, 1056 (Ind.1997) (holding that testimony that the defendant went by a nickname was "irrelevant to any issue in the case other than to show that defendant was involved in the crime.").

■ Additionally, Williams argues that even if Blackwell's testimony is relevant, it is unfairly prejudicial because "[t]he State was attempting to coerce the jury into deducing that if Blackwell knew Williams as 'Gill,' and Dodds testified that 'Gill' was the name of the perpetrator of the crimes, then Williams must be the 'Gill' that Dodds was referring to . . . ." Brief of Appellant at 12. Again we disagree. Although Blackwell's testimony was undoubtedly prejudicial to Williams, in light of the fact that identity was a key issue at trial, its probative value was not substantially outweighed by the danger of unfair prejudice.

A decision concerning relevance and prejudice is within the sound discretion of the trial court, and its decision is afforded a great deal of deference on appeal. *Bacher v. State*, 686 N.E.2d 791, 793 (Ind. 1997), *appeal after remand*, 722 N.E.2d 799 (Ind.1997). We will only reverse a trial court upon a showing that the trial court manifestly abused its discretion and the defendant was denied a fair trial. *Henderson v. State*, 455 N.E.2d 1117, 1119 (Ind.1983). The trial court did not abuse its discretion by admitting Blackwell's testimony.

## II.

■ Williams next contends the trial court erred by refusing to strike the testimony of State's witness Marcus Bradshaw. The essential facts are these. Mishawaka Police Detective Michael Samp was assigned to investigate this case. During the course of his investigation, Samp received information concerning a Marcus Bradshaw. The detective spoke with Bradshaw and took a statement from him, which Bradshaw apparently signed. At trial, the State called Bradshaw to the stand. After a few preliminary questions, the answers to which caught the State by surprise, the prosecutor was granted permission to treat Bradshaw as a hostile witness. Quoting from Bradshaw's statement and facts surrounding how and when it was taken, the State proceeded to ask Bradshaw several questions regarding his knowledge of the facts in this case. The State attempted to elicit from Bradshaw that he had signed a written statement declaring, among other things, that Bradshaw knew Williams as Gill and that Williams had told Bradshaw he was present at the scene on the night of the shootings. R. at 583. However, Bradshaw consistently denied any conversation with Williams and denied he gave any such information to Detective Samp. When shown the written statement with his signature, Bradshaw acknowledged that the signature was his but denied signing the statement. R. at 584–85.

After Bradshaw testified, the State called Detective Samp to the stand. The State questioned the detective regarding the written statement he had taken from Bradshaw. The State then attempted to admit the written statement into evidence. Williams objected, and the trial court sustained his objection. R. at 643. The trial court then instructed the jury as follows:

> Before we took our break the State offered [the] statement of Marcus Bradshaw, Exhibit 57. The Court has ruled that that statement will not be admitted. And I'll remind you of one of the instructions that you were read when we began the trial that you must not consider exhibits or testimony to which an objection was sustained. That is [ ] not a part of this case ladies and gentlemen.

R. at 643. After the State rested, Williams moved to strike Bradshaw's testimony in its entirety and to instruct the jury to disregard it. R. at 691. Williams argued that all of Bradshaw's testimony was irrelevant and overly prejudicial in light of the trial court's ruling regarding the inadmissibility of the written statement. R. at 692. The trial court denied the motion, stating "I don't think there's much in it, if anything, helpful to the [S]tate, but I'm not going to strike the testimony." R. at 693.

Williams contends that all of Bradshaw's testimony was rendered irrelevant by the trial court's ruling that Bradshaw's written statement was inadmissible. Even assuming Williams is correct, we fail to see how he was harmed. When inadmissible evidence has been presented to the jury, reversal of a conviction is required only if the erroneous admission prejudiced the defendant's substantial rights. *Dockery v. State*, 644 N.E.2d 573, 580 (Ind.1994). In determining whether error in the introduction of evidence warrants reversal, the court must assess the probable impact of the evidence on the jury. *Hardin v. State*, 611 N.E.2d 123, 131–32 (Ind.1993), *aff'd in part and vacated in part on other grounds by Swanson v. State*, 666 N.E.2d 397 (Ind.1996). Nothing in Bradshaw's testimony prejudiced Williams. Instead it actually helped him. Bradshaw specifically denied that Williams told him anything; denied knowing Williams as Gill; and declared that any knowledge he received of the crime came from police officers reading from a newspaper account. R. at 603–04. Thus, even if the trial court erred in this case, the error was harmless.

### III.

Williams next contends the evidence is insufficient to support his convictions. More specifically he complains that the identification testimony of Almeka Dodds, the only eyewitness to the event, was incredibly dubious. We first observe that testimony from a single eyewitness is sufficient to sustain a conviction. *Hubbard v. State*, 719 N.E.2d 1219, 1220 (Ind. 1999). Further the "incredible dubiosity rule" is limited to cases where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt. *Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994).

In this case, Williams cites Dodds' inability to identify him in a photo array on the night of the crimes but her ability to identify him in a photo array in September 1998 as evidence that Dodds' testimony is incredibly dubious. Although Dodds was unable to conclusively identify Williams on the night of the crimes, she told police that one of the pictures in the photo array looked like Gill. R. at 431, 662. That picture was of Williams. R. at 665. That Dodds was unable to positively identify Williams on the night of the crimes but was later able to positively identify him is not inherently contradictory. *See Hubbard*, 719 N.E.2d at 1220 (holding that the victim's initial inability to name his attacker, who was an acquaintance, was not inherently incredible).

Further, the facts surrounding Dodds' identification of Williams were fully presented to the jury at trial. Williams extensively cross-examined Dodds regarding her inability to identify him on the night of the crimes. R. at 442–51. Nevertheless, Dodds held firm in her position that she was 100% positive that Williams was involved in these crimes. R. at 442, 443, 448, 450. When asked why she was able to identify Williams a year and a half later, Dodds responded, "When something like that happens to you, you can't take that out [of] your mind. You can't—that picture [doesn't] go away." R. at 450. We conclude that Dodd's eyewitness testimony was sufficient to support Williams' convictions.

## IV.

For his last allegation of error, Williams challenges his sentence. The trial court found one aggravator, Williams' prior criminal record, and no mitigators. R. at 193. It then imposed the maximum sentence for each of the four convictions and ran the sentences consecutively for a total sentence of 200 years imprisonment. R. at 193. The trial court specifically found that the consecutive sentencing was based "upon these four different counts being separate acts, not all part of one event that might be seen to be available for concurrent sentencing." R. at 193. Williams contends this was error because the four offenses constitute an "episode of criminal conduct" under Indiana Code § 35–50–1–2(b), thereby precluding consecutive sentencing.

Indiana Code § 35–50–1–2(b) defines "episode of criminal conduct" as "offenses or a connected series of offenses that are closely related in time, place, and circumstance." Here, the murders, attempted murder, and robbery occurred in the same house and within minutes of each other. Contrary to the trial court's finding, the four offenses qualify as an episode of criminal conduct. *See Ballard v. State*, 715 N.E.2d 1276, 1280 (Ind.Ct.App.1999) (finding episode of criminal conduct where crimes were at same location and occurred within a half hour of each other). Although we agree with Williams on this point, he is still not entitled to relief.

Indiana Code § 35–50–1–2(c) places limitations on consecutive sentencing for an episode of criminal conduct: *"except for crimes of violence*, the total of the consecutive terms of imprisonment . . . to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the presumptive sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted." (emphasis added). Crimes of violence are delineated in the statute and include such crimes as murder and robbery. *See* Ind.Code § 35–50–1–2(a). It does not include attempted murder. *Id.; Ellis v. State*, 736 N.E.2d 731, 736 (Ind.2000). Because murder and robbery are not subject to these limitations, the trial court did not err by ordering the two sentences for murder and the sentence for robbery to run consecutive to each other. As for the sentence for attempted murder, limitations on consecutive sentencing do not apply between crimes of violence and those that are not crimes of violence. *Ellis*, 736 N.E.2d at 737. As such, the trial court also did not err by ordering the sentence for attempted murder to run consecutive to the other sentences.

### Conclusion

We affirm the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.